Good morning. May it please the court, Keith Wesley from Brown George Ross on behalf of the appellant Stop Staring! This was a trade dress infringement case. It was tried to a jury. Eight members of this community took five days out of their lives and heard all the evidence and argument. And they came to an unequivocal conclusion. They said not only was there trade dress infringement, but it was willful. And your honors need not look any further than page four of our opening brief to see why they reached that conclusion. On page four, there are the two trade dresses at issue. These are website trade dresses. The district court wasn't concerned so much about the liability issue. The district court was concerned about the evidence of damages. Isn't that right? To say there wasn't enough to show causation. And so that seemed to be the court's chief concern. I believe that that was the district court's chief concern. And I think it was beyond the district court's discretion then to say not only do we have to go back and retry damages, but everything that this jury found after hearing all the evidence on liability also goes back. We essentially have to start from scratch. So we've said that the court can bifurcate a new trial, but doesn't have to. Now that's my understanding of the state of our precedent. Did you find a case saying it's an abuse of discretion for the district court not to bifurcate liability from damages on a new trial? Your Honor, I'm not aware of any such case, and I think Your Honor is absolutely correct. The district court could have upheld the liability finding because there weren't any errors. The district court could have, but wasn't obliged to. So the district court says, look, there's a problem with your damages case. It's against the clear weight of the evidence. Let's have a new trial on the whole case rather than saying we'll just have a new trial on damages. So wasn't that within the district court's discretion to do that? Your Honor, I'm not aware of a specific case going either way on that point, but I would say that I think it's a very bad precedent for the Ninth Circuit to say that a district court can look at the record and essentially find that there were no problems with liability, and then say we have to start all over again. I think that the Ninth Circuit case law is clear. We have to bend over backwards to be deferential to a jury's verdict. We need to respect the jury, and here what this district judge did was say that all that time you spent, jurors, is all for naught. That even though there were no errors on liability, we're just going to start from scratch. And I think that that is the absolute wrong message for this court to send, and it's contrary to the general principle that we need to defer to juries. That being said, Your Honor, I think that the district court also abused its discretion in ordering a new trial on damages. If I may speak to that for a moment. I think that there was a disconnect. There was a fundamental disconnect as to what the district court thought we were doing with our expert and what we were actually doing with our expert, and the expert is Dr. Robert Wunderlich. He's a well-qualified economic expert. Dr. Wunderlich was saying that the plaintiffs suffered some harm due to what the defendants did, and what he did was standard bedrock economic analysis. He looked at the undisputed figures in the record. He looked at what the defendants' sales were doing during the period at issue. He looked at what the plaintiffs' sales were doing, and he saw a delta, and he saw a corresponding decrease in the plaintiffs' sales alongside a corresponding increase in the defendants' sales. We would expect additional parties to get into the market if stop-staring is making huge profits and is on this enormous trajectory. Those are just market figures. He hasn't accounted for any of that. He took this as a zero-sum game and said, well, looks like these guys would have been on the upswing for the next couple of years, and the other guys did well, so it's a zero-sum game. Obviously, they benefited, and it cost stop-staring because of it. That is way too simplistic for economic analysis, for responsible economic analysis. Your Honor, I beg to differ with the court's characterization of what Dr. Wunderlich did. He did more than simply look at the parties' total sales. He also looked at individual customers that were buying from both of these parties, and he saw a similar corresponding increase in the defendants' sales. It may be due to the ability of the different parties to be able to deliver things on time. It may have to do with the quality of the goods. It can be explained in a number of other ways besides that, and he hasn't accounted for any of that. Your Honor, I absolutely agree that there are potential other factors, but I would emphasize that that's true in every single trademark case. It's really true in any single business case. That's for the jury to decide. But DPST tells us that it's a pretty low standard to have enough evidence for causation. It has to be declining sales plus discounting for other factors. So Mr. Wunderlich showed there were declining sales, but was there any evidence that was adduced at trial that would discount other factors, such as Judge Bivey was alluding to? Absolutely, Your Honor. And what was that evidence? That evidence was the sales data from both parties. In other words, we had Betty... Well, competition, of course, is permitted. So competition alone, showing that there was effective competition, doesn't discount. You have to discount for permitted factors. And in just showing sales figures, I don't see how that discounts for other factors, like more efficient service or whatever those factors might be. Let me try to explain, Your Honor. I think you're absolutely correct if Betty Page Clothing, the defendant, got into the market and was using the infringing trade dress from day one, we couldn't say that it was automatically their use of the trade dress that caused harm. But what we had, actually, was Betty Page Clothing getting into the market without using the trade dress. So we saw what their business was doing, absent infringement. And so you look at the pattern of sales data, and up until the point when they adopted the infringing trade dress, their sales were very slowly rising. And then when they adopted the trade dress, their sales spiked. Again, even then, Counselor, there's all kinds of other explanations that could help contribute to that. I'm not disputing that your client had a beef with them and that they did some things that they probably shouldn't have done. But the question of what caused it... Again, they may have had very effective marketing. They may have had heavy advertising. They may have had pre-existing relationships with people who were awaiting this product. It may have been a superior product. It may have been delivering things on time. Your client may not have... None of that is accounted for. Your Honor, I would go back to the clear language of DSPT, and I think we followed it to a T. We were aware of that case before we put on our evidence here, and we did exactly what this Court said we needed to do. It said proof of a decline in sales combined with evidence tending to discount the importance of other market factors can be sufficient to establish a causal connection. And that's exactly what we did with the evidence of the timing of their adoption of our trade dress. It showed that it wasn't just their great name. It showed that it wasn't their great retail locations. And then we combined that by looking at individual customers that we're selling to. This is not just us putting up two lines and saying that because our line's going down and their line's going up, there's harm. We had other evidence here. We went deeper than that. But I thought the customers you did call as witnesses all testified that they weren't confused and that the trade dress was not a factor in their buying from your competitor. Your Honor, we called two customers. They were very loyal customers. They happened to not be confused at the time. One of them initially tried to testify that she was confused, but the district judge shut us down. Her name was Madeline Yang. The other, Laura Newhall, was actually working for us, so she wasn't confused. So, Your Honor, I understand... So why didn't you call some of the customers who were confused? Because this court has said that it's not required. There's no requirement that we prove actual confusion. And it's very hard to call those customers because they're not our customers. They're the ones who are going away from us and buying from the defendants. And the whole reason why actual confusion is not required under this court's jurisprudence, as well as all the other circuits, is that it's really hard to find these customers who are confused. Well, what about the argument that Tatiana makes that the sales, in fact, did not go up at the time they released the new website, which was in April, but it was because they had spent, I think it was $50,000 or some very high amount of money in February at a trade show. And all these orders came in in February, March, and that even the evidence you have of theirs going up and yours going down, it doesn't match with the infringing website. Judge Malloy, I think your question underscores why it's so important that we have a jury system and why we respect that. Your Honor wasn't there to hear Mr. Glasser testify. The eight people who decided there was willful infringement heard him testify. He was the one testifying about this theory that our sales in February were the real cause of the spike. The jury did not have to believe a word he said. He also said that he had no idea that he was adopting our trade dress when he adopted it, and he completely lacked credibility. Moreover, Bankpage Clothing, the evidence showed, had attended that same trade show in September of 2007. So if it was really the trade show that was the cause, we would have seen the spike in September of 2007. What we saw was a very dramatic spike, and it's in our opening brief in bright colors, red and blue. We see sales down here pre-infringement. We see sales up here post-infringement. This is bedrock damages analysis in this type of case. And your Honors, I just want to, before I sit down, I would like to reserve five minutes in rebuttal, but I want to emphasize how hard it is to prove damages in this type of case. And this court has acknowledged it repeatedly, and that's why this court has said, particularly in cases of deliberate trademark or trade dress infringement, we have to be extremely flexible in terms of what evidence goes to the jury, because we know there's some form of harm, but there's simply no way to pinpoint the exact amount of harm. It's impossible in these types of cases. And so we put all evidence that has any tendency to show the amount of harm, and we let the jury decide. And that's exactly what the jury did here. And it wasn't a runaway jury by any stretch of the imagination. They didn't award all the damages we were seeking. They didn't award all of their profits. It was a very small percentage of what we were asking for. The jury did its job here, and the district judge usurped its role, and we'd ask that this court step in and reinstate the jury's verdict. With that, unless the court has questions at this point, I'm going to sit down and reserve time for rebuttal. Okay. Let me do so. Thank you, Mr. Wesley. Thank you. Good morning. Chris Arledge and Peter Acrasiabi of One LLP for the defendants and appellees. The most important issue today is the standard of review. The standard of review here is abuse of discretion, and that means it is not this court's job to determine whether or not the district court was right when it looked at the evidence and found it woefully lacking, indeed nonexistent, in many areas. The question instead is whether the district court was rational, whether the district court was reasonable in reaching the conclusion that the district court reached. This court has said a ruling constitutes an abuse of discretion if the record contains no evidence rationally supporting the conclusion. The question here today is whether the district judge was rational in looking at Stop Staring's case and finding this case is weak, exceedingly weak in the district court's words, and as a result of that, the result that the jury reached simply cannot stand, and there is no basis to determine irrationality by the district court. Can you help me understand the district court's new trial and motion in Lemon A. Orders and what exactly the court was doing in limiting the new trial? Because I didn't understand that procedurally. Yes, so originally the court granted a new trial finding that the clear weight of the evidence did not support the jury's verdict. And that was on the causation. The court seemed to be focusing on the causation of damages issue. That's how I read it. So she didn't give a JMOL and seemed to allow the liability phase to go forward because there could be some evidence on the cost to redo the website. Isn't that right? I think that's partially right. There's no question that the district court was very disturbed by the damages arguments. There's no doubt about it. I don't think that's all the district court was disturbed by, and that's why she granted a new trial on the whole thing. The court finds that the jury's verdict is contrary to the clear weight of the evidence and possibly resulted from the erroneous admission of evidence by the court. And if you look at the court's many statements about, the court's conclusions about what happened at trial, all of which are the key ones are on the very first page of our brief, you'll see that the court wasn't laser focused on damages. The court was focused on the fact that there wasn't strong evidence anywhere in this thing. Now it is true that what the court ultimately did is reserve this little piece of website redevelopment expenses for a retrial if in fact plaintiff wanted to pursue that. And presumably if plaintiff wanted to pursue some sort of injunctive relief. So help me understand why in the order on the motion of limine, the court excluded any evidence on a new trial on damages. I mean that's essentially what the court said. No showing of lost profits, no showing of unjust enrichment, in other words no showing that the infringement caused damages. Help me understand procedurally what the authority for doing that is. Well the court always on a motion of limine has the ability to not permit expert testimony, number one, which the court can do and that's reviewed for an abuse of discretion. And what was the basis for not allowing expert testimony for Mr. Wunderlich at all? I mean obviously he could testify on declining sales which is an important factor in the causation or damages analysis. But that's only an important factor if there is in fact some evidence of causation. Before the first trial we pointed out to the district court that Mr. Wunderlich's testimony is meaningful and relevant only if there is some evidence that the alleged trade dress infringement caused some increased sales for my client or decreased sales for them. Until you bridge that gap, what Mr. Wunderlich has to say doesn't mean anything. In fact, as your honor noted earlier, there are all kinds of reasons why one company's sales might plateau and another one's might go up. So our point before the first trial is there is no evidence from which anyone can infer causation. And if you can't, then all this testimony about using rulers to figure out where the sales would have been here or there, it should be admissible. So the court didn't agree with you before the first trial and now we've got an order for a new trial. And as I read the court's order, it was the stop staring cannot adduce any additional or further evidence. And so that's where I was confused as to what the basis for that was. Understood. The reason the court didn't agree with us before the first trial is because plaintiff's counsel assured the court other witnesses will fill that gap. They said so very clearly, and in fact they said Mr. Wunderlich will not testify to causation. If he's asked on the stand whether or not he has an opinion on causation, he'll say no, I don't. So it was their representation as to what other evidence would bridge the gap that allowed the case to proceed. Now we're after the first trial before the second trial. We make the same point to the district judge and we say we're here again. We told you the first time that there is no evidence they can adduce to bridge the gap. Their response was not oh yes there is, here's the evidence. Their response was what we showed you the first time was enough, we're going to give you more of the same. At that point, in order to avoid a second colossal waste of resources, the court had no choice but to say well if you're going to show me the same thing that we've already seen, I know that's not good enough. Where is that in the record? So you're telling us that Stop Staring said we don't intend to adduce any additional evidence on this issue. Where is that in the record? In the motion in limine briefing and in the oral argument on the motion in limine issues for the second trial. And so that's where the district court was convinced that she was going to simply get more of the same and it was clear already that that didn't make any sense. Ultimately, the problem we have here is that plaintiff isn't willing to admit that you have to actually show some sort of causation in order to recover monetary relief in a trade draft case. They say in their brief, well you have to show that there is some sort of relationship. They use the term relationship. This vague term, relationship, they have to mean cousins, siblings. It's not a relationship. What you have to show is that there was some causation. Now, we've cited all the cases in our brief, so I'm not going to read all the quotes, but the reality is that Lindy Pinn, for example, says an accounting is intended to award profits only on sales that are attributable to the infringing conduct. Well, they're relying on DSPT, which does say you can prove the fact of damages based on a decline in sales plus evidence discounting other market factors. And they claim that they presented evidence discounting other market factors. Now, you may disagree, or the court may disagree, but that's their position, not that there wasn't any evidence. There are two problems with that. One is DSPT does not say that. And the reason it doesn't say that is because the issue in DSPT was the amount of the damages. The defendant was not appealing, claiming that there was a lack of evidence of causation. So the DSPT court, they assumed that there was some causation. They were trying to figure out the amount of damages that could be appropriate under those circumstances. They were answering a different question. And if you look at Lindy Pinn, Harper House, Skydive Arizona, and a whole host of other cases, this court has made clear over and over and over again that you have to show causation if you're going to get any sort of monetary remedy. The court saw that. Second, there is no other evidence that they showed discounting other factors. What they did is they asserted, well, something happened in April 2008, and once this something happened, then plaintiffs started to lose all of their sales to the defendant. That's it. Court points out rightly they brought up on the stand two retail store owners, and both testimonies were an utter disaster. One of them gave the wrong answer from plaintiff's perspective to every single question, making clear she was never confused. The second one couldn't actually offer an admissible statement because it couldn't lay a foundation for anything. That was their evidence. So there is no discounting of other factors. There is nothing in the record here. That's the problem. Counsel started by saying this is a trade dress case. Well, it became a trade dress case. It became a trade dress case because all of the claims that mattered to the parties were disposed of before trial, and that's all that was left before this case was started. This is in the record. Before this case was started, when a demand letter is sent, there's no complaining about the colors on a website. In the first complaint, the trade dress claim was largely about similarity of dresses and whether there's IP protection in the styles of dresses. The reason we tried a trade dress case is because all of their other claims, breach of contract, fraud, trade secret, trademark damages, all of that disappeared because there was no evidence for it. So the reality is here's the problem the district court was faced with. This is clearly a tail wagging the dog case. Despite that and of a particularly difficult to believe nature. Essentially what they're saying is that sophisticated parties, retail, vintage clothing store owners became confused because at one point plaintiff was using some colors on the website, then they stopped, at some later time defendant starts using the colors on the website. And so sophisticated retail store owners somehow ended up on our website, didn't realize they'd always done business with these guys over here, thought oh we must have always done business with this other supplier because look they have pink and green on the website, and then they started buying from us in mass because of this confusion. That is a pretty silly theory. Now had they had some evidence to support it, and the district court bent over backwards to give them an opportunity, fine, but there was nothing. The district court made clear there was no connection whatsoever between the alleged infringement, in fact I'll quote the district court. Retailer confusion was the key issue in the case, and that key issue also happened to be the most glaring weakness in plaintiff's presentation. Quote two, there was virtually no evidence that the trade residue issue had any impact on either plaintiff's or defendant's business. Council says, well this court wasn't here to see the testimony, they didn't get to see Mr. Glasser testify, they didn't get to see the evidence, that's right, but the district court did, and the district court's conclusion after sitting through all that was, this is a disaster, there's no evidence to support this, and furthermore council, I need you to try to pull the wool over my eyes by having your expert at the last second testify on some things that he said he wouldn't testify on, and frankly I'm a little bit concerned that this entire proceeding was infected by some of this other stuff. Now the question for this court is whether the district court was irrational in reaching that conclusion, and that's the only question. And the answer is clear, there's no way this court can conclude that the district court was irrational. The district court did what it had to do. One last thing, your honor mentioned that this zero sum approach is simplistic, and there's no question about that, I think it's even worse than that. Even if you could show that it was a zero sum game, sometimes it might be a zero sum game when a new person comes into a market and the market share changes, right? You take some market share from the companies that are already there. Even if you have a zero sum situation, and even if Mr. Wunderlich could prove that's what we had here, that doesn't change the fact that you have to show some causal connection between their lost sales and our increased sales. You have to, that's what the law says. And by the way, the law has to say that, because the alternative would be absurd. The alternative would be in a case like this. It's not a counterfeiting case, there's no mark on the product, there's no mark on the packaging. It's simply the use of a color scheme and some shapes on a website that you could claim all of the defendant's profits because they had a similar color scheme on the website with not a shred of evidence whatsoever that there was any causal relationship between lost sales of yours and increased sales of theirs. That can't be the law. Furthermore, their argument that the standard is less for a lost profits analysis than it is for an actual damages analysis, something Mr. Wesley didn't mention, but it's in there pretty simple. First of all, I don't see any evidence in the case law that that's true, but even if it were true here, it's a self-defeating argument. What they're saying is, well, in cases of actual damages made you have to show some causation, but if it's lost profits, there's more wiggle room for the court. That just means the district court has more discretion to look at what happened at trial and say, this isn't close to enough. And that's what the district court did here, unequivocally and rightly. Unless you have any further questions for me, I'll sit down. I don't think so. Thank you, Mr. Arledge. Mr. Wesley, you've got some time reserved. Thank you, Your Honors. I want to start by talking about the abuse of discretion standard that Mr. Arledge led with. Was there an abuse of discretion? Absolutely. No judge has discretion to misapply the law, and it's written in black and white that that is exactly what the district judge was doing when she found our case to be very weak. She found it very weak because she said we didn't march a consumer up onto the stand and say, I was confused by these websites. That is not a weak trade dress case. This court has said over and over that you do not need... I think that what she did was that in combination with some errors  Your Honor, I would ask the court to go back and look at the district judge's opinion. There were two errors that she mentioned. The first was the admissibility of a page from Betty Page Clothing's website that had stop staring clothing written on it. She said it was admissible. She said it was admissible. It was relevant to intent. She said it was overexposed. It was overused. Your Honors, I don't know what that means. The exhibit was in evidence, and I think the record will show if you actually look at the pages cited in our brief that we always use that exhibit for purposes of showing intent, that if anything, the district court went above and beyond her duty to instruct the jury that that was the only issue it was relevant to. And I'm not aware of any case that holds that you should be barred or circumscribed from showing the jury a piece of the trade dress, the infringing trade dress that is at issue. And above and beyond that, just showing where the district court's thinking was on that issue, in the opinion, the district court says it was undisputed that almost nobody saw that webpage. That's just flat out wrong, Your Honors. We cited in our brief evidence in the record showing that 500 people viewed that webpage. Maybe in the district court's mind, 500 people viewing a webpage is almost nobody. I don't think that that's a rational conclusion. So I think that the district court came into this case with a fundamentally skewed viewpoint on the law of trade dress. This is not a counterfeiting case. Mr. Arles is absolutely right. But this court's law holds that false designation of origin claims, trade dress infringement claims, go far beyond counterfeiting. It's not only confusion as to source. It can be confusion as to affiliation or even an endorsement between the parties. Well, let me ask you just briefly, before the second trial, opposing counsel says that you went into court and said in your briefing and in an oral argument that you didn't intend to deduce any additional evidence about causation. Is that correct? Your Honor, I don't recall specifically making that representation. And I'm not aware of a piece of the record showing that. But I'm not going to sit here and say that I didn't say that or my counsel didn't say that. But I think... Did you suggest that you would deduce additional evidence on the causation issues that the court was concerned about? Again, Your Honor, I don't recall if we said we were going to present more evidence or less or the same. But I think the fundamental point is that Judge Bybee especially has expressed concerns about where's the evidence of discounting these other factors. And let me just speak to that for one moment. Here's one other factor, the general state of the economy. The evidence showed that we discounted that factor by saying that So if it was really the economy that was the cause of Stop Staring's harm, why would its competitor that's selling the exact same products to the same customers be going up? Store location. That was one of the alternative factors that they presented to the jury. Again, they were using the same stores. They were using the same name in 2007. We discounted those factors because the jump in their sales was not until they started using our trade dress. Also in the record, Betty Page Clothing is not infringing promotional activities. So for a time they were using a website that looked nothing like ours. And their sales were here, down low. Then they adopted our website trade dress. Their sales spiked. That has to be enough evidence to put forward a claim for actual damages to a jury. Particularly in a case of willful infringement where this court says that the standard of evidence should be loosened and relaxed. One other point, your honors, if I may. There are two forms of monetary recovery we're speaking about today. One form is actual damages. And we've spent a lot of time on actual damages. And we fully acknowledge that causation is necessary. Mr. Olich said we just blew off that requirement. That's not true at all. It's on page 18 of our reply brief. And we repeatedly said that causation is necessary. We just disagree on whether or not we presented enough evidence on that. The other form of monetary recovery that the jury awarded was wrongful profits. And this court has said that in cases of intentional infringement, wrongful profits serve several different purposes. One is compensation. It's a rough proxy of actual damages. The other two are taking away any unjust enrichment as well as deterring future infringement. And in order to do that, what the courts have said is that all a plaintiff has to do, or all a trade dress owner has to do, is put forward the defendant's revenues that have a reasonable relationship to the infringement. And we did that. We showed that they were using the website, the infringing website, to advertise all of their products. And we also had evidence showing that this was a very important aspect of their marketing. Then the burden shifts. The burden is not on us to show that it wasn't their great store location. The burden is not on us to show it wasn't their great name. The burden is on them to show that it was those factors. Now the district judge didn't get that. Counsel, you're well over your time. You may want to wrap up here. Okay. Well, thank you, Your Honor. Just briefly, Mr. Arledge discounts the importance of this case. He says that just a website with a few colors. Well, the Coke bottle is simply a piece of glass with a little red label. It sure is worth a lot of money. And I'd ask that the court look at page four and look at those two websites of two competitors and say, are we going to tell Stop Staring that what happened here is okay? Thank you very much. Thank you. We thank counsel for the argument. That completes the oral argument calendar, and with that, the court is in recess.
judges: Melloy, Bybee, Ikuta